UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| **GRIFFIN HEALTH SERVICES CORP., ET AL**<br><br>**Plaintiffs**<br><br>V.<br><br>**NOVO NORDISK INC., ET AL**<br><br>**Defendants** | Case No.: 3:2024cv01045<br><br><br><br>MARCH 31, 2025 |

### *PLAINTIFFS' OBJECTION TO DEFENDANT'S SECOND MOTION TO DISMISS*

**I.   RESPONSE TO PRELIMINARY STATEMENT**

In response to the Court's order the plaintiffs filed their Second Amended Complaint. The allegations set forth therein plead detailed facts about what was known beginning in 2008 and continuing through 2014. The focus of the plaintiffs' Second Amended Complaint is on the actions and inactions of the defendant, Novo Nordisk. According to the defendant's preliminary statement, however, it appears that Novo Nordisk mistakenly believes that it is the plaintiffs' burden to assert in their complaint allegations to support what Novo Nordisk believes will be its affirmative defense at trial. This absurd notion is not what is required under the law, and certainly not what is required at the pleadings stage.

What was required of the plaintiffs, and what was pled, were the known facts that support its allegations, namely that: (1) Novo Nordisk was aware dating back to at least March of 2009 that the FDA was warning of multi-dose insulin pens, including those that it manufactured and distributed, being used on multiple patients when they were put into institutional use (SAC ¶9), (2) in March 2013 Novo Nordisk was named as a defendant in a class action lawsuit brought in

1

New York arising out of the use of multi-dose pens with multiple patients at Olean General Hospital in New York (SAC ¶15), (3) despite having direct knowledge of such incidents, Novo Nordisk thereafter provided on-site training in multiple years at Griffin Hospital without providing adequate training that would include proper warnings including to avoid the use of its multi-dose insulin pens on multiple patients (SAC ¶¶17-21), and (4) that in February of 2015, after this problem of a single pen being used at multiple institutions over many years, the FDA issued an order requiring that Novo Nordisk to place a warning label directly on its multi-dose insulin pens advising that the pens were for single patient use only (SAC ¶33).

A particular fact, that was also pled, and that the defendant has continually failed to address or accept responsibility for, is that Novo Nordisk knew or should have known that its insulin pen was defective in design as it allowed for the backflow of blood into the insulin pens vial that could then result in the spread of blood-borne pathogens, such as HIV and Hepatitis. SAC ¶¶18-19. Further, despite having this knowledge, Novo Nordisk failed to warn Griffin Hospital of this defect, and it also failed to train Griffin Hospital's staff by specifically advising the staff of the defect so that they could understand why this product presented a risk should it be used on more than one patient. *Id*., at ¶¶21-22. This was not a defect that was obvious to the user. *Id*., at ¶11. The syringe was disposable and intended to be changed after every use. *Id*., at ¶12. The fact that the re-usable reservoir became contaminated would not be known to the user without an instruction and appropriate labelling to advise the user of this design flaw. *Id*.

Notably, the defendant has attached as Exhibit A of its Request for Judicial Notice a "true and correct copy of a composite of the July 15, 2009 FDA-approved Physician Insert and the August 17, 2009 FDA-approved Patient Information for Novo Nordisk's Levemir Flex Pen," Exhibit B a "true and correct copy of a composite of the October 12, 2009 FDA-approved

Physician Insert and the July 15, 2009 FDA-approved Patient Information for Novo Nordisk' NovoLog Flexpen," and as Exhibit C a "true and correct copy of a composite of the August 5, 2009 FDA-approved package label for Novo Nordisk's Levemir FlexPen and the August 4, 2009 FDA-approved package label Novo Nordisk's NovoLog FlexPen." These exhibits alone are sufficient to establish Novo Nordisk's failures in light of their knowledge.

To start, of the pens shown in these exhibits, not a single one is labeled as "single-patient use only" nor do any of them provide any warning as to the risk of transmission of blood-borne disease. *See* Exhibits A, B, and C of the defendant's motion for judicial notice. The issue of properly labeling the pens themselves would not be rectified by the defendant until the FDA forced Novo Nordisk's hand on February 25, 2015, by requiring them to label the pen itself as "single patient use only." Further, none of the packaging labels or physician inserts warn about the transmission of blood-borne diseases from the **sharing of the pens** or of the risk of backflow of blood **into the pen**. *Id*. In fact, the only warning related to disease transmission on the labels is related to the **needle** of the pen which is interchangeable. *See* Ex. A ("Be careful when handling used **needles** to avoid **needle sticks** and transfer of infectious diseases.") and Ex. B ("Be careful when handling used **needles** to avoid **needle sticks** and transfer of infectious diseases."). As such, Novo Nordisk failed to provide adequate warnings and appropriate packaging to properly advise about a potentially life-threatening risk from its defective product by advising that, after use, the reservoir of insulin in the reusable pen could become contaminated with blood and human tissue cells. Novo Nordisk also failed to inform Griffin's staff of this risk after it assumed its duty to train them in the use of its new product. Although these failures and omissions have already been pled

3

in the plaintiffs' complaint, the defendants believe that the packaging that Novo Nordisk relies upon actually substantiates their claim that the warnings made were insufficient.[1]

As to the substance of the defendant's argument, Novo Nordisk attempts to shift its burden to plead affirmative defenses for comparative fault onto the plaintiffs and repeatedly mentions "omissions" that it believes the plaintiffs bear the burden of pleading. As will be discussed below, it is not the plaintiff's burden to plead the defendant's anticipated defense and any facts in support thereof. The only omissions the plaintiffs need to plead to properly assert their claim under the law, are what have already been pled, and were just substantiated by Novo Nordisk itself.

## II.     STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). A plaintiff need only "plead factual content that allows the court to draw the **reasonable inference** that the defendant is liable for the misconduct alleged." *Id.*, at 7 (Emphasis added).

Furthermore, in a motion to dismiss pursuant to Rule 12(b)(6), the court "takes well-pleaded facts as true and draws all reasonable inferences in favor of plaintiff" and "merely assess[es] the legal feasibility of the complaint." *See*, *A Slice of Pie Prods., LLC v. Wayans Bros. Entm't*, 392 F. Supp. 2d 297, 306 (D. Conn. 2005) (citing *Hishon v. King & Spalding*, 467 U.S. 69,

---

[1] It should also be noted that these inserts are patient and physician directed. Advising a patient and a physician of a warning for a pen that is presumably going home with a patient for individual use in the community is different than a warning for a pen being placed in institutional use. The inadequacy of the warnings is demonstrated by the number of institutions that reported issues with multi-patient use of a single pen.

73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984); *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 779 (2d Cir. 1984). *Aztec Energy Partners, Inc.* v. *Sensor Switch, Inc.*, 531 F. Supp. 2d 226, 228 (D. Conn. 2007).  In ruling on a motion to dismiss under Rule 12(b)(6) the court is limited to considering the pleadings and the documents attached thereto. *Jaufman v. Levine*, 2007 U.S. Dist. LEXIS 72883, *14.

## II.     ARGUMENT

### A.     The Plaintiffs' Have Adequately Pled Their Claims Under the CPLA.

#### 1.     **Failure to Warn**

As an initial note, there is no appellate authority concerning what is required to properly plead a failure to warn claim under Connecticut law in federal court and district courts have reached different results on what is required to properly plead a failure to warn claim. What is clear, however, is that the pleading standard and burden shifting the defendant wishes to force upon the plaintiffs goes far beyond the *Twombly* plausibility pleading standard.

In *Karazin* v. *Wright Medical Technology, Inc.*, Docket No. 3:17cv823 (JBA), 2018 U.S. Dist. LEXIS 157459 (D. Conn. Sep. 14, 2018), the district court rejected a defendant's Motion to Dismiss the plaintiff's failure to warn claim raising similar arguments that the defendant in the present case has raised. In *Karazin*, the defendant argued that the plaintiff's allegations were insufficient to state a claim because they did not address how the applicable warnings and/or instructions were allegedly inadequate, what warnings and/or instructions should have been provided, or that had such warnings and/or instructions been provided the plaintiffs would not have suffered the injuries alleged. *Id*., at *13. The court rejected these assertions finding that to "the extent that Defendant requests detailed factual allegations regarding exactly what instructions should have been provided, its argument is unavailing as that information is both the type of

'detailed or elaborate factual allegations' not required at this stage of litigation . . . ." *Id*., at \*13-14. The court then found that the plaintiffs had properly pled their failure to warn claim by alleging the specific risks of the device, what the defendants allegedly knew, the source of that information, and how the warning was inadequate. *Id*., at \*14.

In the present case, the plaintiffs have more than adequately pled sufficient facts to make out their claim for failure to warn, the defendant's willful ignorance of the text of the plaintiffs' complaint does not change that. The plaintiffs identify the pens defects numerous times throughout the complaint, i.e. that Novo Nordisk's pens were defective by allowing the backflow of blood into the cartridge following injection, thus allowing for the spread of blood-borne pathogens and diseases. *See* DN 56.00 at ¶¶8-12, 19-21, 25, 41, and 49. The plaintiffs also identify that the defendant knew of this defect and how they learned of this defect. *Id*., at ¶¶13-19. The complaint then explicitly states on numerous occasions how the defendant's warnings, or lack thereof, were inadequate. *Id*., at ¶¶8-12, 19-21, 25, 41, and 49.[2]

---

[2] Specifically in subparagraph (c) of paragraph 49 the plaintiffs allege "in that they lacked any warning on the pens themselves that the pens were to be used only with a single patient;" in subparagraph (d) "that the defendant **failed to provide any warning or even information to advise of the existence of the risk that human tissue and/or blood could flow back into the insulin reservoir after each use**;" in subparagraph (e) "in that any warnings on the packaging or in the inserts were ineffective and insufficient both because they lacked an adequate explanation of the risk associated with the pens for the insulin reservoir to become contaminated due to backflow of human tissue and blood after each use and that in institutional use the packaging and inserts did not remain with the insulin pens when they were being used with patients;" and subparagraph (f) "in that the safe use of the insulin pens, **which were a new and novel way to distribute insulin, particularly in an institutional setting, required thorough training by the manufacturer** including advising the users of the pens as to how to use the pens were to be used including that the pens were for single patient use only, that the pens allowed for the backflow of human blood and tissue back into the reservoir making them inappropriate for multiple patient use and that changing the needle was not sufficient to alleviate the risk of blood-borne disease with these insulin pens in light of the fact that it was known by the defendant that the reservoir could become contaminated with human blood and/or tissue after each use, yet the defendant failed to provide such training."

The defendant asserts that the plaintiffs' claim must fail because they do not plead what warning they were provided by the defendant and how they were inadequate, however, as was made clear in subparagraph (d) of paragraph 49 of the complaint the plaintiffs allege that the defendant "failed to provide any warning or even information to advise of the existence of the risk that human tissue and/or blood could flow back into the insulin reservoir after each use." Ironically, the defendant's own exhibits in support of their Motion to Dismiss substantiate the plaintiffs' claims as they clearly provide no information or warning whatsoever about potential backflow of blood into the insulin cartridge. *See* Exhibits A, B, and C of DN 61.00.

There is also no merit or legal basis to the defendants' contention that the plaintiffs have not properly pled that the defendant's training was negligent. The plaintiffs have pled robust facts to support their claim. The plaintiffs have alleged that the safe use of Novo Nordisk's pens, which were a new and novel way to distribute insulin in an institutional setting, required thorough training by the manufacturer, i.e. Novo Nordisk. *See* DN 56 at ¶49(f). Novo Nordisk undertook this duty to train and trained Griffins staff, who relied upon this training . *Id*., at ¶23. Novo Nordisk, under its duty to train, failed to train and warn staff as to the pen's defect and risk, which was that the pen allowed for backflow into the reusable reservoir of the pen which posed a risk of blood-borne disease to patients should the pen be used with multiple patients. *Id*., at ¶¶11-12, 19, and 21. Novo Nordisk provided **no warnings or training** as to this defect, despite being on notice of the defect from incidents at numerous other facilities across the country. *Id*., at ¶8. Finally, this failure to properly train was a direct and proximate cause of the plaintiffs as described in ¶50 of the complaint.

In sum, these facts clearly establish that Novo Nordisk undertook the duty to train Griffin's staff, did in fact train Griffin's staff, had knowledge of the defectiveness and risk of their pens,

failed to properly by warn and train Griffin staff as to the defective function and inherent risk of the pens by way of blood/tissue backflow, and that these omissions and failures caused the plaintiffs' damages. Although the plaintiffs believe that these allegations are more than sufficiently detailed, in response to any argument that the plaintiffs need to provide even more details, it is important to consider that at this stage of litigation such detail is not required and will likely be supported and supplemented as discovery continues. *Karazin* at *13-14.

The defendant's attempt to obfuscate what warnings and knowledge the plaintiffs' staff had at the time have no bearing at this stage on a Motion to Dismiss. The sole issue on claims for failure to warn and failure to train is whether or not the **defendant** provided adequate warning and training. The plaintiffs have alleged that they received **no warning** as to the issue of tissue backflow from the defendant and that without this information any warning or training would be insufficient as this is vital information for a healthcare provider to have, especially with regard to a product that is designed to be used multiple times after exchanging the needle for a sterile one. *Id*., at ¶¶11-12, 19, and 21. To the extent that the defendant is arguing that the plaintiffs potentially had knowledge from sources other than the defendant that has no bearing as to the legal sufficiency of the plaintiffs' failure to warn and failure to properly train claim against the defendant. Those arguments go not to the legal sufficiency of the claim, but instead go toward allegations of comparative fault, which is not addressed on a Motion to Dismiss.

    **2.**    **Design Defect**

At the pleading stage, to properly plead a design defect the plaintiffs need only allege the following:

> A design defect claim is predicated on a product which is otherwise properly manufactured, but is nonetheless unreasonably dangerous because its attributes can cause an unexpected injury. . . . A product is defectively designed if: (1) it failed to perform as safely as an ordinary consumer would expect when used in a reasonably

8

> foreseeable manner (the "ordinary consumer expectations" test); or (2) in the case of complex products, the risk of danger inherent in the design of the product outweighs its utility (the "modified consumer expectations" test).

*Diblasi* v. *Smith & Nephew, Inc.*, Docket No. 3:20cv566 (MPS), 2021 U.S. Dist. LEXIS 29213, at *5 (D. Conn. Feb. 17, 2021)(Citations omitted), *see also Frissora v. Smith & Nephew, Inc.,* Docket No. 3:23-CV-1506 (SVN), 2024 U.S. Dist. LEXIS 225834, at *9 (D. Conn. Dec. 13, 2024). Reading the facts in the most favorable light to the plaintiffs, it is clear that the plaintiffs have easily met their burden.

As stated above, the plaintiffs specifically alleged numerous times that the defendants pens were defective in that they allowed for the backflow of blood and human tissue into the reservoir of the pen and that they were defective by not having a label for "single patient use only" affixed to the **pen itself**, which the defendant was later required to add to the design by the FDA on February 25, 2015, after numerous incidents, similar to the one Griffin Hospital experienced, occurred over several years at multiple institutions around the country. DN 56 at ¶¶6, 33, 40-43, 49(a-c and f). The court can conclude from these allegations that the plaintiffs are alleging that the defendant's pen is defective in that insulin pens in institutional settings should not allow for the backflow of blood and human tissue into their reservoir and insulin pens should have been directly labeled with "single patient use only" from the outset given the FDA's eventual requirement to following the defendant's failure to respond properly to these incidents with a voluntary design change. Clearly, the risk of the product, as it was designed and labelled when placed in an institutional setting has outweighed any utility the pens may have.

At this stage, no further allegations or details are needed. This case will require extensive discovery, and the plaintiffs need to obtain additional materials related to the

9

design of the pen from the defendant and expert witness evaluation as they work to build their case.

### 3. Negligence Subclaim

The defendant has failed to adequately brief or provide any legal basis for the dismissal of the plaintiffs' negligence claim and merely relies upon its reasoning from its prior sections. For this reason alone, the Court should deny the defendant's Motion to Dismiss.

Regardless, the plaintiffs have adequately pled that the defendant had a duty, breached that duty, and that the breach of that duty lead to the plaintiffs' damages. *Id*., at ¶¶52-54. Unlike the plaintiff in *Frissora v. Smith & Nephew, Inc.,* Docket No. 3:23-CV-1506 (SVN), 2024 U.S. Dist. LEXIS 225834 (D. Conn. Dec. 13, 2024),, here the plaintiffs have alleged in great detail how the defendant's conduct was negligent throughout the complaint in that they designed a defective pen that allowed backflow, knew or should have known that they pen was defective based on numerous nationwide incidents and reporting, and that in spite of that knowledge failed to adequately warn and train Griffin staff about the pens defective nature and the risks associated with using the reusable pen.

Based upon what has been pled, the plaintiff's negligence subclaim should not be dismissed.

### 4. Negligent Misrepresentation Subclaim

"Traditionally, an action for negligent misrepresentation requires the plaintiff to establish (1) that the defendant made a misrepresentation of fact (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result." *Coppola Const. Co. v. Hoffman Enterprises Ltd. P'ship*, 309 Conn. 342, 351-52, 71 A.3d 480 (2013). A negligent misrepresentation claim may be based on the defendant's omissions.

*Office Furniture Rental Alliance, LLC* v. *Liberty Mutual Fire Ins. Co.*, 981 F. Supp. 2d 111, 120 (D. Conn. 2013). In the present case, the plaintiffs have clearly alleged that the defendant made negligent and critical omissions about its pens related to the issue of backflow of human tissue into the pen and the lack of training and warning from the defendant about the single patient use of the pen. These facts are alleged throughout the complaint and have been repeated numerous times in the above sections.

Of note, the plaintiffs did have a special relationship with the defendant. As alleged in the complaint, the defendants were not simply providers of the insulin pens, they also undertook the duty to provide training to the plaintiffs' staff about their new and novel product. This was training that the plaintiffs relied upon. As such, the plaintiffs' and defendant's relationship arose to a closer and higher degree than most business relationships related to the purchase of medical devices as the plaintiffs relied upon the manufacturer defendant to train its medical personnel. Given that the defendant undertook a duty to train health care providers, the court can infer that the plaintiffs had a special relationship of trust and confidence that created a duty for the defendant to impart complete and correct information to the plaintiff's medical staff. This information includes accurate medical information, such as how the risks and the function of the defendant's insulin pens, including advising of the backflow issue. Accordingly, the plaintiffs have properly presented numerous factual allegations that support their negligent misrepresentation claim.

### 5. Indemnification Subclaim

To properly plead a claim for indemnification, a party must plead the following:

(1) the party against whom the indemnification is sought was negligent; (2) that party's active negligence, rather than the defendant's own passive negligence, was

>the direct, immediate cause of the accident and the resulting injuries and death; (3) the other party was in control of the situation to the exclusion of the defendant seeking reimbursement; and (4) the defendant did not know of the other party's negligence, had no reason to anticipate it, and reasonably could rely on the other party not to be negligent.

*Bennett* v. *Metro-North Commuter Railroad Co.*, Docket No. 3:23-CV-01296 (JCH), 2024 U.S. Dist. LEXIS 211911, at *8-9 (D. Conn. Nov. 21, 2024). Upon even a facial review of paragraphs 63-68 of the complaint, it is clear that the plaintiffs have not only alleged these elements but also provided factual support for them. Again, at this stage the only thing at issue is the legal sufficiency of the pleadings. The defendant's defenses to these allegations have no bearing at this stage of the litigation. Simply because the defendant disagrees with the allegations levied against them that does not make the allegations legally insufficient.

Of note, under Connecticut law exclusive control exists when a party "has '**control of the dangerous condition** to the exclusion of the other negligent party . . . .'" *Bennett* v. *Metro-North Commuter Railroad Co.*, Docket No. 3:23-CV-01296 (JCH), 2024 U.S. Dist. LEXIS 211911, at *12-13 (D. Conn. Nov. 21, 2024). The dangerous conditions present in this case are defective design of the pen that allows for backflow of blood and human tissue, inadequate design of the pen itself in its failure to have an adequate warning as a part of part of the pen, and the inadequate training regarding the use of the pen and the defect in the pen related to the backflow of human tissue that was known or should have been known by the defendant as the manufacturer of the pen. Griffin did not design the pen, manufacture the pen, advertise the pen, and relied upon the defendant to train its staff as to the proper and safe use of the new and novel reusable pen. As such, it is clear that the defendant, Novo Nordisk, was in exclusive control over the dangerous conditions in this case.

### 6.     Breach of Implied Warranty of Merchantability Under Conn. Gen. Stat. § 42-a-3-314 as a CPLA Subclaim

It is not entirely clear what the defendant's argument is related to the plaintiffs' subclaim for breach of implied warranty of merchantability. The Court in its prior ruling found that "Griffin Health should be allowed to bring any well-pleaded UCC causes of actions in this case as a basis for a product liability 'sub-claim'" and addressed the plaintiff's claims as such before explicitly stating that the Court "denies Novo Nordisk's Motion to the extent it seeks to dismiss this CPLA 'sub-claim' for breach of implied warranty of merchantability." DN 55 at *15. The defendant has brought no new argument here and incorrectly states that the plaintiffs were not allowed to replead this subclaim. The plaintiffs have, as the Court previously noted, now directly pleaded this claim as a subclaim under the CPLA and given that the defendant has not properly briefed in this issue in its motion and have for the second time sought have this claim dismissed without any new argument or information, the plaintiffs respectfully request that the Court end the defendant's baseless and repeated attacks by denying this motion with prejudice.

### 7.     The Plaintiffs Can Recover for the Damage Caused by Novo Nordisk

The argument that the plaintiffs cannot recover for damages caused by Novo Nordisk's actions has already been briefed, addressed, and ruled upon by the Court. The Court in its prior ruling on the allowable damages in this case was clear:

> Shemitz is analogous to the instant case. There, the Connecticut Supreme Court **allowed the plaintiff to pursue damages under the CPLA for costs <u>it incurred remedying damage</u> done to third party property, the damage having been allegedly caused by the defendant's product**. Id. at 227–29. Similarly, here, **Griffin Health seeks damages it incurred remedying personal injuries to third parties, these injuries were allegedly caused by Novo Nordisk's product**. While Shemitz involved third-party property damage and this case involves third-party personal injuries, **the CPLA applies with equal force to personal injuries and property damage**. Conn. Gen. Stat. § 52-572m(b) ("Product liability claim

13

> includes <u>all claims or actions brought for personal injury</u>, death or <u>property damage</u> caused by the manufacture, construction, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging or labeling of any product." (internal quotation marks omitted and emphasis added)). Thus, applying Shemitz to the instant case, **the court concludes Griffin Health may seek damages stemming from the costs it incurred reimbursing patients for injuries allegedly caused by Novo Nordisk's products.**

DN 55 at *5-6 (Emphasis added). Accordingly, the Court has already ruled to allow the plaintiffs to recover for damages "it incurred remedying damage done" by Novo Nordisk." The defendant now, for the second time, seeks to have those very same damages, which were direct costs incurred by the plaintiffs to remedy personal injury and property damage, excluded. Given the prior briefing and ruling by the Court on this issue, the defendant's argument should be summarily denied. Out of an abundance of caution, the plaintiffs have reargued the same law that the Court found analogous the present situation below.

Commercial loss is not defined by the Connecticut Products Liability Act (CPLA). This is not a case where the plaintiff is claiming a business loss of profit or related economic losses from the defective produce. Instead, the loss is one for property damage and personal injuries that arose out of the use of the defendant's product. While there is no appellate law on the issue there are superior court decisions which provide some guidance. In *Silent Stalker, Inc. v. Vickers Engineering et al.*, 2003 Conn. Super. LEXIS 2192 (2003) a superior court judge refused to strike a claim for indemnity for payment made to an individual who suffered injuries using a tree peg product. Leslie Warren sued Silent Stalker claiming that he was injured when tree pegs that it had sold to him failed. Silent Stalker settled with Warren for $650,000 and then sued Vickers Engineering (Vickers) and Production Fabricators (Production) for contribution and indemnification. Production claimed that the counts asserting recovery under the CPLA failed as a matter of law as Silent Stalkers' case was one seeking to recover a "commercial loss" between

commercial parties. The trial court disagreed, "the ban on the recovery of commercial losses between commercial parties contained in the product liability statute does not prevent the plaintiff in this case from asserting claims of contribution and indemnity for the reimbursement of monies paid to compensate a product user for personal injuries incurred from his use of a defective product. *Silent Stalker, Inc.* v. *Vickers Engineering*, Docket No. CV020078923S, 2003 Conn. Super. LEXIS 2192, at *11 (Super. July 25, 2003).

The Connecticut Supreme Court has rejected the notion that commercial loss should be interpreted broadly to eliminate claims for indemnification between commercial parties. It recognized that there is a split of authority at the trial court level as to how broadly "commercial loss" should be defined. It favorably cited *Silent Stalker* and some other cases similar to it in *dicta* supporting the interpretation that "commercial loss" should not be defined narrowly so as to allow product sellers to avoid their responsibilities. *Sylvan R. Shemitz Designs, Inc. v. Newark Corp.* 291 Conn. 224, 236-237 (2000). Novo Nordisk relies on several superior court and district court decisions that pre-date *Sylvan R. Shemitz Designs, Inc.*

Here, the claim is that the product caused personal injuries for which Griffin was sued for allegedly causing through its use of the product. By way of this action, Griffin is seeking reimbursement for losses it suffered due to the defective pen, defective warnings related to the pens sold by Novo Nordisk, and the negligent training that led to harm from the use of that product and in turn the harm to third parties that looked to Griffin for reimbursement. The harm pled here is based on personal injuries and property damage suffered as a result of the defective product. In *Sylvan R. Shemitz Designs, Inc.* the harm to the plaintiff was property damage caused by a component part. The *Shemitz* court determined that Shemitz could pursue its claim against the product manufacturer for the losses it suffered in terms of the costs to replace the defective part

15

and to repair the damages caused by the defective part to the product. Comparing *Shemitz* to the facts here, Griffin is similarly seeking to recover the costs to repair the harm caused by the insulin pens that it claims were defective and thus caused the loss. As such, the defendant's argument to limit the damages suffered by the plaintiffs should be denied.

  **8.**  **The Plaintiff has Properly Pled a Claim for Punitive Damages**

The Court in its prior ruling on the defendant's Motion to Dismiss dismissed the plaintiffs' claim for punitive damages finding that since the "Amended Complaint fails to adequately allege a claim based on negligence, . . . concludes the Amended Complaint fails to allege facts suggesting Novo Nordisk not only acted negligently, but recklessly." Here, the plaintiffs have repleaded and submitted additional facts and language to support their claims not only for negligence, but also to establish the reckless nature of the defendant's actions that entitles them to punitive damages.

Pursuant to Connecticut General Statutes Section 52-240b, an award of punitive damages is available when "the claimant proves that the harm suffered was the result of the product seller's reckless disregard for the safety of product users, consumers or others who were injured by the product." Further, under Connecticut law, "(r)ecklessness requires a conscious choice of a course of action either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man, and the actor must recognize that his conduct involves a risk substantially greater . . . than that which is necessary to make his conduct negligent. *Begley v. Kohl & Madden Printing Ink Co.*, 157 Conn. 445, 450-51, 254 A.2d 907 (1969), quoting 2 Restatement, Torts § 500, comment [g]." (Internal quotation marks omitted.) *Bishop v. Kelly*, 206 Conn. 608, 614-15, 539 A.2d 108 (1988). M*atthiessen* v. *Vanech*, 266 Conn. 822, 832, 836 A.2d 394 (2003).

As has been outlined in the Second Amended Complaint and briefed numerous times above, the facts of this case that have been pled directly establish that Novo Nordisk acted with "reckless disregard for the safety of product users, consumers or others who were injured by the product." Section 52-240b. It is alleged that Novo Nordisk knew or should have known of the defect nature of their pen in that it allowed for the backflow of human tissue which could lead to the spreading of blood-borne diseases such as hepatitis and HIV based on reporting in medical literature, governmental warnings, and numerous incidents of potential disease transmission at institutions throughout the country over a number of years. Despite this knowledge, Novo Nordisk, in reckless disregard of the safety of its products users, chose not to provide proper training and failed to warn Griffin Hospital staff of this serious and harmful defect and failed to properly design and label their pens directly, which the FDA forced them to do in 2015. These choices by Novo Nordisk not only put the plaintiffs' patients at risk for contracting potentially deadly blood-borne diseases, but thousands of patients across the country at numerous other institutions as well. Through discovery, the plaintiffs will seek to establish that these actions and failures to act, were made likely because Novo Nordisk chose to place their profits over the people who relied upon their products. If this kind of conduct and wide-spread damage does not constitute recklessness, what does?

Accordingly, based on the allegations there is more than sufficient basis for the Court to at the very least infer that it is alleged that Novo Nordisk has acted with reckless disregard and find that the plaintiffs' have sufficiently pleaded their claim for punitive damages.

### III.   CONCLUSION

For all of the above reasons the defendant's motion to dismiss should be denied.

                        THE PLAINTIFFS
                        GRIFFIN HEALTH SERVICES
                        CORPORATION AND
                        GRIFFIN HOSPITAL

                        /S/ #03674
By:   _____
                        DAVID J. ROBERTSON
                        (CT 03674)
                        HEIDELL, PITTONI, MURPHY & BACH, LLP
                        6 Corporate Drive, Ste 840
                        Shelton, CT 06484
                        Telephone: 203-382-9700
                        Facsimile: 203-382-9730
                        E-mail: drobertson@hpmb.com

## CERTIFICATE OF SERVICE

The undersigned counsel for the plaintiffs hereby certifies that on this 31st day of March 2025, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties of record listed below by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/S/ #03674
_____

DAVID J. ROBERTSON
(CT 03674)
HEIDELL, PITTONI, MURPHY
& BACH, LLP
6 Corporate Drive, Ste 840
Shelton, CT 06484
Telephone: 203-382-9700
Facsimile: 203-382-9730
E-mail: drobertson@hpmb.com